UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 10-11133-GAO

MONA ABOUHAMAD,
Plaintiff,

v.

BANK OF AMERICA, CORP.,
Defendant.

ORDER
September 11, 2012

O'TOOLE, D.J.

The magistrate judge to whom this matter was referred has filed a report and recommendation (dkt. no. 22) with respect to the defendant's Motion (dkt. no. 14) for Summary Judgment. Neither party has objected to the report. After carefully reviewing the pleadings, the parties' motion papers, and the report and recommendation itself, I adopt the report and recommendation of the magistrate.

Accordingly, I ADOPT the recommendation. Defendant's Motion (dkt. no. 14) for Summary Judgment is GRANTED as to Counts I, II and III, with the exception of the portions of Counts I and II that allege failure to accommodate with respect to the attendance warning.

It is SO ORDERED

/s/ George A. O'Toole, Jr.
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MONA ABOUHAMAD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 10-11133-GAO |
| ) | |
| BANK OF AMERICA CORP., ) | |
| ) | |
| Defendant. ) | |
| ) | |

REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

July 27, 2012

SOROKIN, C.M.J.

Pending before the Court is the Defendant, Bank of America Corporation's, Motion for Summary Judgment (Docket #14). For the following reasons, I RECOMMEND that the Court ALLOW the Defendant's motion IN PART and DENY it IN PART.

I. FACTUAL AND PROCEDURAL BACKGROUND

The Plaintiff, Mona Abouhamad, began her employment in 1995 with a predecessor of Bank of America in a retail banking branch in Boston's Back Bay. Docket #16 at ¶ 1. In 1996, Abouhamad transferred to the Needham Banking Center, where she remained until her employment terminated on August 4, 2009. Id. at ¶ 2. Abouhamad held the position of Personal Banker throughout her tenure with Bank of America and its predecessors. Id. As a Personal Banker, Abouhamad was responsible for generating business by selling products and services to

1

existing and potential customers of Bank of America. Id. at ¶ 3. Her specific duties included opening deposit accounts, taking loan and credit card applications, responding to customer inquiries and concerns, and recognizing and referring cross-selling opportunities. Id. Abouhamad was always employed on a part-time basis, working approximately twenty hours per week. Id. at ¶ 4. During the latter part of her employment, Abouhamad's regular schedule was from 11:15 a.m. to 4:15 p.m. on Monday and Tuesday, from 12:00 p.m. to 5:15 p.m. on Friday, and from 8:30 a.m. to 1:15 p.m. on Saturday. Id.

Abouhamad has struggled with bouts of depression for twenty-three years and was clinically diagnosed in 1999. Id. at ¶ 6. Additionally, Abouhamad has a diagnosis of post traumatic stress disorder and suffers from chronic anxiety and insomnia. Docket #18-2 at ¶ 6. Abouhamad also has difficulty sleeping and at times, she suffers from depression-induced anxiety. Docket #16 at ¶ 6. Abouhamad asserts that she was able to perform the essential functions of her position despite these conditions, although she required an accommodation of a short, temporary medical leave first in 2007 and then again between July 24, 2009 and August 4, 2009. Docket #18-2 at ¶ 7. Abouhamad's physician did not restrict her from working full time.

Abouhamad testified that in 2007, when her depression worsened, she required an extended absence from work. Docket #16 at ¶ 10. Abouhamad followed the bank's policy and contacted MetLife, the bank's third-party vendor, concerning applicable leaves. Id. Abouhamad also spoke to her then-supervisor, Richard Thall (the Needham Banking Center Manager) about her desire to take a few days off from work. Id. Abouhamad did not tell Thall the reason for her need to seek leave, because of its personal nature. Docket #16-1 at 25. Because she was a part-time associate, Abouhamad had not worked the requisite hours to be eligible for leave under the

Family Medical Leave Act (FMLA); therefore, she was granted an unpaid leave of absence under the bank's unpaid medical leave policy from September 11, 2007, through September 23, 2007. Docket #16 at ¶ 11. When Abouhamad returned from her leave, her access to the computer system was back in place without any need for her to take any action (because her manager had arranged for her access to be restored upon her return). Docket #18-2 at ¶ 9.

All Personal Bankers were required to meet certain quarterly sales goals as set forth by the market team. Docket #16 at ¶ 15. Abouhamad's quarterly sales goals were lower than those of the other two full-time Personal Bankers who worked at the Needham Banking Center. Id. Abouhamad had been struggling to meet her sales goals since 2008, and had been coached by Thall concerning sales techniques she might employ to improve her numbers. Id. at ¶ 16.

In April 2009, Renee Welch transferred to the Needham Banking Center, replacing Thall as the Banking Center Manager and becoming Abouhamad's new supervisor. Id. at ¶¶ 12-13. On April 14, 2009, Welch issued a verbal warning to all three Personal Bankers for failing to meet their sales goals for the first quarter of 2009. Id. at ¶ 14. The warning noted that Abouhamad failed to meet the required minimum account opening and unit sales goals. Id. at ¶ 17. Abouhamad had achieved 58.18% of her goal for account opening and 69.34% of her goal for unit sales. Id. The warning noted, "[f]ailure to meet expectations may result in further disciplinary action up to and including termination." Docket #18-5. Welch (whom Abouhamad admitted was under pressure from the market to improve the overall sales performance of the Needham Banking Center) thereafter frequently stressed to the Personal Bankers the importance of meeting their goals. Docket #16 at ¶ 18. Welch spoke to the Personal Bankers at least once per month about her dissatisfaction with their sales performance. Docket #18-2 at ¶ 12.

3

On Friday, July 24, 2009, Abouhamad woke up feeling "terrible." Docket #16 at ¶ 19. Her husband, Henry Abouhamad, described her as "hyper and edgy." Id. Abouhamad affirms that she was not scheduled to work that day. Docket #18-2 at ¶ 15; Docket #18-3 at 90-91. When her husband realized that Abouhamad did not appear well, he asked her to contact Mary Coakley, R.N., whom Abouhamad had been seeing since January 21, 2009, for monitoring of her antidepressant medication. Docket #16 at ¶ 21. Coakley was the only medical provider whom Abouhamad was seeing in 2009. Id. At 3:00 p.m., after Coakley failed to return Abouhamad's phone calls, Abouhamad's husband drove her to Coakley's office. Id. at ¶ 22. Coakley examined her and determined that she was suffering from withdrawal from anti-anxiety medication she had purchased over the internet, without a doctor's prescription. Id. at ¶ 23. Coakley directed Abouhamad to enter a detox program and referred her to Newton-Wellesley Hospital. Id. Abouhamad, who was not sedated or incoherent, arrived at Newton-Wellesley Hospital with her husband at around 4:00 p.m. Id. at ¶ 24.

Abouhamad's husband contacted the bank between 4:30 p.m. and 5:00 p.m. on Friday, July 24, 2009, and informed Welch that Abouhamad "is going to be admitted for a week to two weeks, and I want to make sure you find somebody to cover for her." [1] Docket #18-4 at 30-31. According to Abouhamad's husband, Welch inquired about Abouhamad's well-being and then said: "you take care of your wife. . . . I'll take care of the bank." Id. Abouhamad's husband did not give Welch any information about the reason for Abouhamad's hospitalization, nor did

---

[1] Contrary to the Bank's contention, Abouhamad's husband had a basis to predict the one-to-two-week admission based upon his communications with the "nurse in triage," (see Docket #18-4 at 30), even though Abouhamad was not actually admitted to the hospital until later that evening. Docket # 16 at ¶ 28.

Welch inquire further. Docket #16 at ¶ 27. He offered to give Welch his phone number, but she declined saying it was unnecessary. Docket #18-4 at 31. At 11:33 p.m. that evening, following a doctor's examination, Abouhamad was informed that she would be admitted to the detox center. Docket #16 at ¶ 28.

After Abouhamad failed to report to work on Tuesday, July 28 and Wednesday July 29, Brendan Kilgore, Assistant Banking Center Manager, contacted her husband at Abouhamad's home to inquire about Abouhamad's health and her expected return to work. Id. at ¶ 29. Mr. Abouhamad advised Kilgore that Abouhamad was still in the hospital and that she might be discharged within a day or two. Id. at ¶ 30. Abouhamad was discharged on Thursday, July 30, 2009. Id. at ¶ 31. Abouhamad called the banking center for the first time on Friday, July 31, 2009, and spoke with Kilgore. Id. at ¶ 32. Kilgore told Abouhamad that she should report to work on Tuesday, August 4, 2009, as she was not needed on Monday, August 3rd. Id.

Abouhamad returned to work on August 4, 2009. Id. at ¶ 33. She provided Welch with a note from Milton Schmidt, M.D., an attending physician at Newton-Wellesley Hospital, releasing Abouhamad to work without any restrictions. Id. Other than the brief call with Kilgore on July 3, 2009, and the note from Dr. Schmidt on August 4, 2009, Abouhamad did not provide any other information to the bank about her absence. Id. at ¶ 34. Welch had not received any notification from Aetna (the bank's leave administrator) that Abouhamad had requested a leave of absence for medical reasons. Id. at ¶ 35. Abouhamad did not contact Aetna until after she had been discharged from the hospital, and she did not follow the same procedure for requesting leave as she had followed in 2007. Id. at ¶ 36. Aetna ultimately informed Abouhamad that she was ineligible for FMLA leave because she had not worked the minimum hours required in the

5

twelve months preceding her absence. Id. at ¶ 37.

When Abouhamad returned to work her computer access had not been re-enabled. (Docket #18-2 at ¶ 26). Plaintiff asked Welch to arrange for her computer access to be re-enabled so that she could work, but Welch replied that she was too busy.[2] Id. at ¶ 27.

Near the end of the day on August 4, 2009, Welch and Kilgore held a meeting with Abouhamad, during which Welch gave to Abouhamad a "FINAL Written Warning - Attendance." Docket #16-1 at 82. The warning indicated that Abouhamad had "failed to adhere to the approved SSW Market Sick Call Procedure" on Friday, July 24, 2009, which was "deemed a call-in policy violation." Id. The call-in policy violation was detailed as follows:

> **Friday 7/24** (Failure to personally notify BCM of absence)
> **Saturday 7/25** (Failure to notify or update BCM of continued absence)
> **Tuesday 7/28** (Additional failure to call or update BCM with current status. Failure to return a call inquiring on status)
> **Wednesday 7/29** (A second call was placed and received by your husband informing ABCM of intentions to return on Monday 8/3)
> **Friday 7/31** (Mona called into the BC for the first time.)
>
> Id.

The warning indicates that these actions "created a 10 consecutive calendar day absence requiring insurance approved medical leave as well as doctor's authorization to return to work," and that Abouhamad had failed to properly excuse herself for five consecutive scheduled shifts. Id. Abouhamad tried explaining that her husband had spoken to Welch, but Welch would not acknowledge this. Docket #18-2 at ¶ 30. The warning also stated that, "[f]ailure to meet

---

[2] At her deposition, Welch testified that it was up to the employee to call Human Resources to let them know when they were returning to work so they could reinstate access to the computer system. Docket #18-8 at 11.

expectations may result in further disciplinary action up to and including termination." Docket #18-7.

During the August 4, 2009, meeting, Welch also discussed with Abouhamad her second quarter results, which closed in June 2009. Docket #16 at ¶ 40. Welch had reviewed the sales figures prior to the second quarter and had compared those figures against the required goals. Id. Due to Abouhamad's failure to meet her quarterly goals, Welch administered a written warning highlighting Abouhamad's failure to achieve 100% of goal in five different areas of sales. Id. at ¶ 41. The warning stated that, "[f]ailure to meet expectations may result in further disciplinary action up to and including termination." Docket #18-6. The written warning was dated June 30, 2009, reflecting the end of the second quarter. Docket #16 at ¶ 42. Kilgore explained that although the written warning was administered on August 4, 2009, it included the incorrect June date due to poor administration. Id. Abouhamad was very upset upon receiving the warnings and did not review the content or verify the sales numbers cited. Id. at ¶ 43.

In her affidavit, Abouhamad states that Welch told her that these warnings "would likely lead to termination." Docket #18-2 at ¶ 32. Per the affidavit, Abouhamad also stated that she "would" (as opposed to did) resign, before Welch could fire her. Id. at ¶ 34. In her deposition, however, Abouhamad testified that after receiving the warnings she said:

> [W]ell, I guess you don't want me here. I better retire then. And then I went home, and I regretted saying that, and I called Human Resources and I said, I said this, and I really don't want to retire. I want to stay in the bank. I just was upset. And I don't, I didn't mean it.[3]

---

[3] Later in her deposition, Plaintiff clarified that she had stated that she was going to resign, not retire. (Docket #18-3 at 135-36) ("Resign. Not retire, resign. I'm sorry, I'm going to resign.")

7

Docket #18-3 at 135; see Docket #18-2 at ¶ 34 ("I stated to Ms. Welch that I would resign before she could fire me."). Abouhamad concedes in her affidavit, as she did in her deposition, that after she went home she "called Human Resources Department for the bank and informed then that I did want my job and did not wish to resign."[4] Docket # 18-2 at ¶ 35. Abouhamad states that Welch was happy that she was leaving because "she didn't say, no, no, I want you to stay. She didn't say anything." Docket #16-1 at 53. Abouhamad left work after this meeting, since it was the end of the workday. Docket #18-2 at ¶ 34.

On August 7, 2009, Abouhamad returned to the Needham Banking Center and advised Welch that she was rescinding her resignation. Id. at ¶ 48. Welch contacted the bank's Human Resources center and her manager, and a decision was made to honor Abouhamad's resignation. Id. at ¶ 49. Abouhamad was asked to return all bank property and to leave the premises. Id. On that same day, August 7, 2009, Welch sent to Abouhamad a letter confirming Abouhamad's resignation on August 4, 2009. Id. at ¶ 50.

On July 6, 2010, Abouhamad brought suit, bringing three claims for (1) for disability discrimination and a failure to accommodate her disability, in violation of the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.; (2) for disability discrimination and a failure to accommodate her disability, in violation of the Massachusetts Fair Employment Practices Act, M.G.L. c. 151B, § 4; and, (3) for violation of the FMLA, 29 U.S.C. § 2601, et seq. (FMLA).

---

[4] Abouhamad had previously threatened to resign from her position, but then changed her mind. Id. at ¶ 51. In 2007, in response to Thall's coaching about her interactions with an assistant banking manager, Abouhamad threatened to resign her position. Id. However, after feeling bad about her decision, she approached Thall, gave him a hug and apologized to him about her behavior. Id.

8

Docket # 1. Bank of America now moves for summary judgment pursuant to Fed. R. Civ. P. 56, asserting that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law. Docket # 14.

II. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once a party has properly supported its motion for summary judgment, the burden shifts to the non-moving party, who "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing there is a genuine issue for trial." Barbour v. Dynamics Research Corp., 63 F.3d 32, 37 (1st Cir.1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). Moreover, the Court is "obliged to []view the record in the light most favorable to the nonmoving party, and to draw all reasonable inferences in the nonmoving party's favor." LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir.1993). Even so, the Court is to ignore "conclusory allegations, improbable inferences, and unsupported speculation." Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir.2009) (quotation omitted).

III. DISCUSSION

A. Disability Discrimination

To establish disability discrimination under either the ADA (as in Count I of the Complaint) or M.G.L. c. 151B (Count II), a plaintiff may prove her case by presenting direct evidence of discrimination or she may prove it indirectly by using the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 186 (1st Cir.2011). Under McDonnell Douglas, a plaintiff must

9

establish a prima facie case by demonstrating: "(1) that [s]he suffers from a disability; (2) that [s]he was nevertheless able to perform the essential functions of his job, either with or without reasonable accommodation; and (3) that [the defendant] took adverse action against [her] because of the disability." Wright v. CompUSA, Inc., 352 F.3d 472, 475 (1st Cir.2003). If the plaintiff can establish a prima facie case, then the burden of production shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for its employment decision and to produce credible evidence to show that the reason advanced was the real reason." Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100, 105 (1st Cir.2005). If the defendant offers such a reason, the burden shifts back to the plaintiff and she must "proffer evidence to establish that [the defendant's] non-discriminatory justification is mere pretext, cloaking discriminatory animus." Id.

Abouhamad asserts discrimination both with respect to the end of her employment relationship with the bank and with respect to the two warnings she received on the last day she worked. Her claim fails to the extent predicated on the end of her employment. Abouhamad was an at-will employee. The undisputed evidence, drawing all reasonable inferences in her favor, establishes that she resigned her position. She testified that she resigned. Her later action – i.e., seeking to retract her resignation – confirms her testimony that she resigned. The record reflects no genuine dispute of material fact regarding whether or not Abouhamad resigned. Abouhamad may not create a disputed issue of fact merely by contradicting, by her own affidavit, her previous sworn testimony, without adequate explanation of the discrepancy. Cleveland v. Policy Management Systems Corp., 526 U.S. 795, 806 (1999). Accordingly Abouhamad has no claim under either statutory scheme (i.e., the ADA or c. 151B) arising out of

the August 7th Notice of Separation, because she had previously resigned her employment.[5]

Regarding the performance warning for failing to meet her second-quarter sales quotas, Abouhamad cannot meet her burden of proof to establish that the Bank issued the warning because of her disability. The undisputed evidence establishes that prior to her leave, Welch had previously warned Abouhamad (both on a monthly basis and at the end of the first quarter). Welch also had warned the other two sales persons at the branch for failure to make quota in the first quarter of 2009. Abouhamad does not dispute that she failed to meet her sales quotas. In these circumstances, the temporal proximity between the warning and Abouhamad's leave is in and of itself insufficient to support a claim for disability discrimination.

The warning for Abouhamad's unexcused absences while she was in the hospital presents a closer question. "To be adverse, an action must materially change the conditions of [the plaintiff's] employ." Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir.2002). "Material changes include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'" Id. (quoting Hernandez-Torres v. Intercontinental Trading, Inc., 158 F.3d 43, 47 (1st Cir.1998)). While a reprimand may constitute an adverse action, it must carry with it tangible consequences in addition to correcting some workplace behavior that management perceived as needing correction. Bhatti v. Trustees of Boston University, 659 F.3d 64, 73 (1st Cir.2011) (citing Billings v. Town of Grafton, 515 F.3d 39, 54–55 (1st Cir.2008)). Here, because Abouhamad resigned her position immediately upon receiving the written warning, there was not an

---

[5] Although one can envision a constructive discharge claim based upon such a scenario (i.e. that Abouhamad did resign, but did so because the bank made her continued employment

11

opportunity for the warning to have had tangible consequences beyond the correction of her perceived failure to adhere to the bank's attendance policies. Thus, Abouhamad cannot succeed on this claim.

B.  Failure to Accommodate

Abouhamad also asserts that the bank violated the ADA and Chapter 151B by failing to grant her a reasonable accommodation without penalty when it threatened to fire her and issued her two written warnings on the day of her return from a medical leave.[6]

The ADA and Chapter 151B impose liability on an employer for "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]" 42 U.S.C. § 12112(5)(A); see Mass. Gen. Laws ch. 151B, § 4(16).

> To survive summary judgment on her "reasonable accommodation claim, [Plaintiff] must produce enough evidence for a reasonable jury to find that (1) she is disabled within the meaning of the ADA, (2) she was able to perform the essential functions of the job with or without a reasonable accommodation, and (3) [Defendant], despite knowing of [Plaintiff's] disability, did not reasonably accommodate it."

Estades-Negroni v. Assocs. Corp. of N. Am., 377 F.3d 58, 63 (1st Cir.2004) (quoting Rocafort v. IBM Corp., 334 F.3d 115, 119 (1st Cir.2003)).

The bank does not dispute that Abouhamad was disabled under the relevant statutes or

---

untenable), Abouhamad has not advanced such an argument.

[6] For purposes of this case, analysis under the ADA and Chapter 151B is identical. See Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 153-54 (1st Cir. 2009). The possible difference in the law in light of the Supreme Judicial Court's decision in Lipschitz v. Raytheon, 434 Mass. 493 (2001) does not impact the analysis in this case.

that she was able to perform the essential functions of the job. It argues instead that Abouhamad's claim fails because she failed to notify, properly, the bank of her need for accommodation, i.e. an unpaid medical leave for the seven to ten day period beginning with her in-patient hospital admission. The bank also asserts that it provided Abouhamad with a reasonable accommodation for her alleged disability.

The claim regarding the warning for poor sales performance fails because the performance issue arose <u>before</u> the medical leave. It did not relate to the ten day period during which she was not working. The evidence that Abouhamad failed to meet her sales quotas is undisputed and that this failure had been an ongoing concern for her supervisor is also undisputed.

The other warning presents a different case. "Employers cannot be required to accommodate needs they do not know exist." <u>Conway v. Boston Edison Co.</u>, 745 F. Supp. 773, 783-84 (D. Mass. 1990) (Skinner, J.) ("Because plaintiff never asked defendant to accommodate her handicap in the hiring process, defendant did not discriminate against her by refusing to waive the typing test."). Thus, "[o]rdinarily, the employer's duty to accommodate is triggered by a request from the employee." <u>Freadman v. Metro. Prop. & Cas. Ins. Co.</u>, 484 F.3d 91, 102 (1st Cir.2007). For an employee's actions to constitute a sufficiently requested accommodation, the request "(1) must be sufficiently direct and specific, and (2) must explain how the accommodation requested is linked to some disability." <u>Id.</u> at 102-03 (quotation omitted). However, where an employee's disability prevents the employee from requesting an accommodation, or where the need for an accommodation is obvious, different rules may apply. <u>Id.</u> at 103 n.11.

Here, the facts (viewed in the light most favorable to Abouhamad) establish that Abouhamad, via her husband, notified the bank of her inpatient admission to the hospital, reaffirmed her stay in response to inquiry from the bank, and contacted the bank the first day after her discharge. She then notified the bank of her ability to return to work and her possession of a medical excuse letter from her doctor for the period in which she was in the hospital. The bank instructed her to report to work. Upon her return, the bank issued her a written disciplinary warning carrying with it the threat of possible future discharge. The bank did this without undertaking any inquiry into whether Abouhamad suffered from a disability requiring a reasonable accommodation. These facts create a genuine issue of material fact regarding whether the bank possessed sufficient knowledge to trigger a duty to inquire further.

The bank's other argument – that notwithstanding the written warning it issued to Abouhamad for missing work during her in-patient hospital stay, the bank in fact reasonably accommodated her by granting her a medical leave of absence for this period – is utterly without merit. I fail to see, and the bank has not explained, how disciplinary sanctions for an absence constitute a reasonable accommodation of the disability necessitating the absence.

Accordingly, I RECOMMEND that the Court ALLOW the Motion on this Count as to the performance warning and DENY the Motion on this Count as to the absence warning.[7]

C.  Family and Medical Leave Act

In her Complaint, Abouhamad also brings a claim pursuant to the FMLA, 29 U.S.C. §

---

[7] I recognize that Abouhamad may have only limited damages arising from the alleged failure to accommodate in light of her resignation that day and the absence of a constructive discharge claim, however, limited damage would not defeat the viability of the reasonable accommodation claim.

14

2601. Docket #1 at ¶¶ 57-63. In its Motion, the bank indicates that Abouhamad agreed to voluntarily dismiss her FMLA claim because the evidence has shown that Abouhamad was not eligible for benefits under the FMLA. Docket #14 at 1 n.1. Abouhamad does not address her FMLA claim within her opposition to the motion.

Accordingly, I hereby RECOMMEND that the Court ALLOW Defendant's Motion for Summary Judgment with respect to Plaintiff's FMLA claim.

IV.  CONCLUSION

For the foregoing reasons, I RECOMMEND that the Court ALLOW IN PART and DENY IN PART the Defendant's Motion for Summary Judgment.[8] I RECOMMEND that the Court DENY the motion with respect to Counts I and II, but only to the extent predicated upon the Defendant's failure to accommodate with respect to the attendance warning, and that the Court otherwise ALLOW the motion with respect to Counts I and II. I FURTHER RECOMMEND that the Court ALLOW the motion with respect to Count III.

/s / Leo T. Sorokin
Leo T. Sorokin
Chief United States Magistrate Judge

---

[8] The Parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation. The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections. See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b). The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140 (1985).